**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

TYRONE JOHN PASTURES,

      Petitioner,

v.                                                                    Case No. 3:22-cv-1383-TJC-LLL

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,
et al.,

      Respondents.

_____

## ORDER

### I.   Status

Petitioner, an inmate of the Florida penal system, initiated this action by filing a pro se Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 raising two grounds for relief (Grounds One and Two). Doc. 1. He challenges a state court (Duval County, Florida) judgment of conviction for attempted second degree murder. He is serving a thirty-year term of incarceration. Respondents filed a Response to the Petition. See Doc. 7; Resp.[1] And Petitioner replied. See Doc. 8. In June 2025, after obtaining the Court's approval, Petitioner filed a Supplement to his Petition that raised an additional two grounds (Grounds

_____

[1] Attached to the Response are several exhibits. See Docs.7-1 to 7-15. The Court cites the exhibits as "Resp. Ex."

Three and Four). Doc. 14. Respondents filed a Supplemental Response. See Doc. 16. And Petitioner filed a Supplemental Reply. See Doc. 18. This case is ripe for review.[2]

## II.    Governing Legal Principles

### A. Standard Under AEDPA

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal habeas corpus petition. See Ledford v. Warden, Ga. Diagnostic & Classification Prison, 818 F.3d 600, 642 (11th Cir. 2016), cert. denied, 137 S. Ct. 1432 (2017). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" Id. (quoting Greene v. Fisher, 565 U.S. 34, 38 (2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the petitioner's claims on the merits. See Marshall v. Sec'y Fla. Dep't of Corr., 828 F.3d 1277, 1285 (11th Cir. 2016). The

---

[2] "In a habeas corpus proceeding, the burden is on the petitioner to establish the need for an evidentiary hearing." Jones v. Sec'y, Fla. Dep't of Corr., 834 F.3d 1299, 1318 (11th Cir. 2016) (citing Chavez v. Sec'y Fla. Dep't of Corr., 647 F.3d 1057, 1060 (11th Cir. 2011)). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 550 U.S. 465, 474 (2007) (citation omitted). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Id. The Court finds that "further factual development" is unnecessary. Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003). Thus, an evidentiary hearing will not be conducted.

state court need not issue an opinion explaining its rationale for the state court's decision to qualify as an adjudication on the merits. See Harrington v. Richter, 562 U.S. 86, 100 (2011). When the state court's adjudication on the merits is unaccompanied by an explanation,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018).

When a state court has adjudicated a petitioner's claims on the merits, a federal court cannot grant habeas relief unless the state court's adjudication of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(1), (2). A state court's factual findings are "presumed to be correct" unless rebutted "by clear and convincing evidence." Id. § 2254(e)(1).

> AEDPA "imposes a highly deferential standard for evaluating state court rulings" and "demands that state-court decisions be given the benefit of the doubt."

3

Renico v. Lett, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (internal quotation marks omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. [at 102] (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)). The Supreme Court has repeatedly instructed lower federal courts that an unreasonable application of law requires more than mere error or even clear error. See, e.g., Mitchell v. Esparza, 540 U.S. 12, 18 (2003); Lockyer, 538 U.S. at 75 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); Williams v. Taylor, 529 U.S. 362, 410 (2000) ("[A]n unreasonable application of federal law is different from an incorrect application of federal law.").

Bishop v. Warden, GDCP, 726 F.3d 1243, 1253-54 (11th Cir. 2013) (internal citations modified).

## B. Exhaustion and Procedural Default

There are prerequisites to federal habeas review. Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all state court remedies that are available for challenging his state conviction. See 28 U.S.C. § 2254(b)(1)(A). To exhaust state remedies, the petitioner must "fairly present[]" every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. Castille v. Peoples, 489 U.S. 346, 351 (1989) (emphasis omitted). Thus, to properly exhaust a claim, "state prisoners

4

must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); see also Pope v. Rich, 358 F.3d 852, 854 (11th Cir. 2004) (noting "that Boerckel applies to the state collateral review process as well as the direct appeal process.").

In addressing exhaustion, the United States Supreme Court explained:

> Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights.'" Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L.Ed.2d 865 (1995) (per curiam) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L.Ed.2d 438 (1971)). To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim. Duncan, supra, at 365-366, 115 S. Ct. 887; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L.Ed.2d 1 (1999).

Baldwin v. Reese, 541 U.S. 27, 29 (2004).

A state prisoner's failure to properly exhaust available state remedies results in a procedural default which raises a potential bar to federal habeas review. The United States Supreme Court has explained the doctrine of procedural default as follows:

> Federal habeas courts reviewing the constitutionality of a state prisoner's conviction and sentence are guided

5

by rules designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism. These rules include the doctrine of procedural default, under which a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule. See, e.g., Coleman,[3] supra, at 747–748, 111 S. Ct. 2546; Sykes,[4] supra, at 84–85, 97 S. Ct. 2497. A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed. See, e.g., Walker v. Martin, 562 U.S. --, --, 131 S. Ct. 1120, 1127–1128, 179 L.Ed.2d 62 (2011); Beard v. Kindler, 558 U.S. --, --, 130 S. Ct. 612, 617–618, 175 L.Ed.2d 417 (2009). The doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law. See Coleman, 501 U.S., at 750, 111 S. Ct. 2546.

Martinez v. Ryan, 566 U.S. 1, 9-10 (2012). Thus, procedural defaults may be excused under certain circumstances. Notwithstanding that a claim has been procedurally defaulted, a federal court may still consider the claim if a state habeas petitioner can show either (1) cause for and actual prejudice from the default; or (2) a fundamental miscarriage of justice. Ward v. Hall, 592 F.3d

---

[3] Coleman v. Thompson, 501 U.S. 722 (1991).

[4] Wainwright v. Sykes, 433 U.S. 72 (1977).

6

1144, 1157 (11th Cir. 2010). In order for a petitioner to establish cause and prejudice,

> the procedural default "must result from some objective factor external to the defense that prevented [him] from raising the claim and which cannot be fairly attributable to his own conduct." McCoy v. Newsome, 953 F.2d 1252, 1258 (11th Cir. 1992) (quoting Carrier, 477 U.S. at 488, 106 S. Ct. 2639).[5] Under the prejudice prong, [a petitioner] must show that "the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness." Id. at 1261 (quoting Carrier, 477 U.S. at 494, 106 S. Ct. 2639).

Wright v. Hopper, 169 F.3d 695, 706 (11th Cir. 1999).

In the absence of a showing of cause and prejudice, a petitioner may receive consideration on the merits of a procedurally defaulted claim if the petitioner can establish that a fundamental miscarriage of justice, the continued incarceration of one who is actually innocent, otherwise would result. The Eleventh Circuit has explained:

> [I]f a petitioner cannot show cause and prejudice, there remains yet another avenue for him to receive consideration on the merits of his procedurally defaulted claim. "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." Carrier, 477 U.S. at 496, 106 S. Ct. at 2649. "This exception is exceedingly narrow in scope," however, and requires proof of actual innocence, not just legal innocence.

---

[5] Murray v. Carrier, 477 U.S. 478 (1986).

7

> Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001).

Ward, 592 F.3d at 1157. "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense." Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001) (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995)). Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." Calderon v. Thompson, 523 U.S. 538, 559 (1998) (quoting Schlup, 513 U.S. at 324). With the rarity of such evidence, in most cases, allegations of actual innocence are ultimately summarily rejected. Schlup, 513 U.S. at 324.

**C. Ineffective Assistance of Trial Counsel**

"The Sixth Amendment guarantees criminal defendants effective assistance of counsel. That right is denied when a defense counsel's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (per curiam) (citing Wiggins v. Smith, 539 U.S. 510, 521 (2003), and Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish ineffective assistance, a person must show that: (1) counsel's performance was outside the wide range of reasonable, professional assistance; and (2) counsel's deficient performance prejudiced the challenger in that there is a reasonable probability that the

8

outcome of the proceeding would have been different absent counsel's deficient performance. Strickland, 466 U.S. at 687.

Notably, there is no "iron-clad rule requiring a court to tackle one prong of the Strickland test before the other." Ward v. Hall, 592 F.3d 1144, 1163 (11th Cir. 2010). Since both prongs of the two-part Strickland test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." Id. (citing Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in Strickland: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." 466 U.S. at 697.

"The question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether that determination was unreasonable - a substantially higher threshold." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied Strickland's deferential standard," then a federal court may not disturb a state-court decision denying the claim. Richter, 562 U.S. at 105. As such, "[s]urmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371 (2010). "Reviewing courts apply a 'strong presumption' that counsel's representation was 'within the wide range of reasonable professional assistance.'" Daniel v.

9

Comm'r, Ala. Dep't of Corr., 822 F.3d 1248, 1262 (11th Cir. 2016) (quoting Strickland, 466 U.S. at 689). "When this presumption is combined with § 2254(d), the result is double deference to the state court ruling on counsel's performance." Id. (citing Richter, 562 U.S. at 105); see also Evans v. Sec'y, Dep't of Corr., 703 F.3d 1316, 1333-35 (11th Cir. 2013) (en banc) (Jordan, J., concurring); Rutherford v. Crosby, 385 F.3d 1300, 1309 (11th Cir. 2004).

## III.  **Factual and Procedural History**

On direct appeal, Petitioner's appellate counsel filed an initial brief pursuant to Anders v. California, 386 U.S. 738 (1967). The following procedural and factual history is taken from that initial brief.

> On April 26, 2017, Christopher Gilbert was shot inside a Jacksonville Popeyes Chicken while working the night shift. At trial, Mr. Gilbert and a number of his coworkers identified Appellant as the assailant. Appellant's defense was one of misidentification.

> Antonio Jones, a cook at Popeyes, testified that around 9 p.m., he went outside the restaurant with Mr. Gilbert and two other coworkers. While outside, Mr. Jones saw a person driving a blue Ford or Dodge go through the drive-thru. He identified Appellant in court as the person he saw driving the truck. According to Mr. Jones, Appellant seemed angry and he yelled at Mr. Jones and the others, who went back inside the restaurant, which was closed to customers. Mr. Jones said Appellant then came inside the restaurant and physically attacked Mr. Gilbert before shooting him. Appellant then got back into his truck, where an older passenger was seated, and left.

> On cross-examination Mr. Jones testified that in addition to being a convicted felon, he was a marijuana user who smoked every day. He also testified that he was sure Appellant was driving a blue

10

Ford. Jones was also asked about the features of the person he saw. According to him, the shooter was shorter than 5'10" and was between 27-30 years old. Prior to looking at a photospread compiled by law enforcement, Jones and two other witnesses met with a forensic sketch artist. Jones testified that the three did not agree on the suspect's features during that meeting. After the sketch was complete, Jones signed it, saying that the person in the sketch was the shooter.

Jerrica Lundy, the general manager on duty the night Mr. Gilbert was shot, testified next. Ms. Lundy said that the shooter, who she spoke to while outside the restaurant, was driving a dark, older model tr[u]ck with a toolbox in the back. She described the driver as a brown, slender male with dreadlocks, between 25-30 years old. Ms. Lundy identified Appellant in court as the man she saw.

According to Ms. Lundy, Appellant entered the Popeyes, said a few words and started hitting Mr. Gilbert. He then pulled out a gun, shot Mr. Gilbert, and left. Ms. Lundy was shown a photospread by law enforcement and picked out a person who she said "favored" Appellant but appeared to be younger than him. Ms. Lundy admitted to questioning her decision to pick that particular photograph. Ms. Lundy was also present when a sketch was done of the suspect and testified that the sketch was "a pretty close drawing of the shooter." She did not think there was a big difference between being 21 years old and 35 years old, nor did she think there was a big difference between being 5'8" and 6 feet tall.

Earlexia Jackson was working the drive-thru when a dark green truck came through. There were two people in the truck and the driver had dreadlocks. The driver of the truck ordered and when he was told the total, said it was too expensive. The driver then pulled forward and came inside the restaurant. Ms. Jackson then saw the driver take a swing at Mr. Gilbert and heard a gunshot, at which point she dropped to the ground. She too was shown a photospread by law enforcement but was unable to positively identify anybody.

Following the testimony of his coworkers, Christopher Gilbert took the stand. According to Mr. Gilbert, he was outside the

11

restaurant when a green truck with front and side dents pulled up and the driver tried to go inside. Mr. Gilbert and his coworkers told the man that the inside of the restaurant was closed and directed him to the drive thru. After Mr. Gilbert went back inside the Popeyes, the driver, who Gilbert identified as Appellant, entered the restaurant and said[,] "What did you say?" before punching him. Appellant then shot Mr. Gilbert. Mr. Gilbert was shown a photospread by law enforcement on July 6, 2017 and was unable to identify anybody. However[,] he did identify Appellant at a later court proceeding.

During cross-examination Mr. Gilbert was questioned regarding his varied descriptions of the suspect's vehicle. He also testified that his only opportunity to see Appellant was during the short attack inside the restaurant and described him as being a male in [his] 30s who was 5'8" – 5'9" and stocky with a goatee.

No forensic evidence was developed in the case. Detective Cory Williams, the lead detective on the case, testified that he obtained and reviewed all the surveillance video from Popeyes except footage from the kitchen and manager's office. Law enforcement developed Appellant as a suspect and Detective Williams went to Appellant's house in July of 2017. According to Detective Williams, the vehicle that was seen on the video was parked outside Appellant's house. Detective Williams spoke to Appellant via telephone sometime between July 6, 2017 and July 26, 2017. He then conducted a videotaped interview with Appellant on July 26, 2017, which was played for the jury. In the interview, Appellant denied any involvement in the incident and said he would have been at his girlfriend's house on the day Mr. Gilbert was shot. Appellant's girlfriend, Hannah Stebbins testified and echoed Appellant's testimony. Ms. Stebbins said she was at work from 3-11 p.m. on the day in question but that Appellant would have been at her house even if she was not there.

The State presented cell phone evidence through special agent Robert Simmonds of the FBI. Agent Simmonds analyzed cell phone records for phone number 904-713-1244, specifically transactions that took place between 3:00 and 10:00 p.m. He plotted cell tower information on a map, along with the locations of the Popeyes restaurant, Ms. Stebbins['s] house and Appellant's

12

father[']s house. During cross-examination Agent Simmonds conceded that he was unable to triangulate the exact location of the handset and that the phone records do not show how far a handset is away from a particular tower. He also conceded that towers can get overloaded and that the strongest and clearest signal, which a handset utilizes, does not always come from the closest tower.

After the State rested its case, Appellant entered into evidence the forensic sketch compiled based on the descriptions of Mr. Jones, Ms. Lundy and Ms. Jackson. Appellant declined to testify. In rebuttal, the state presented the testimony of James McMillan, a forensic artist employed by the State Attorney's Office. Mr. McMillian testified to the process he utilized when completing the sketch in Appellant's case.

Following closing arguments and deliberation, the jury returned a verdict of guilty as charged.

Resp. Ex. E (record citations omitted).

## IV. <u>The Petition</u>

### a. Ground One

Petitioner contends that his trial counsel was ineffective for disregarding Petitioner's desire to admit his involvement and testify in his own defense. Doc. 1 at 7. He maintains he would "admit what happened, and express his regret for shooting the victim." <u>Id.</u> He also contends that he asked trial counsel to obtain the best plea offer she could from the state, but trial counsel refused to negotiate a plea on his behalf. <u>Id.</u>

Petitioner raised this claim in ground one of his Florida Rule of Criminal Procedure 3.850 motion. Resp. Ex. I at 12-21. The trial court summarily denied the claim as follows:

13

Defendant alleges he asked counsel to "obtain the best plea from the State," but counsel told him that "none had been made and she wasn't going to ask." He further alleges that although he had denied guilt during his videotaped interview with law enforcement, he subsequently told counsel he wanted to "come clean," admit what happened, and express his regret for shooting the victim. He states:

> Defendant wanted to explain that in the heat [of] the argument, which he admittedly instigated, he had attracted others whose numbers Defendant did not know and that at the time, he felt the sudden need to act to avoid further escalation, and to escape the potential that he would himself be outnumbered and accosted.

He argues that he wanted to take the stand at trial, admit he overreacted, and apologize to the victim, but counsel told him that was "not happening" and that he would be crazy to confess in light of the videotaped interview.

Defendant further alleges that counsel stated she would maintain his innocence, let the jury hear the interview, and challenge the identification evidence, which she described as "really weak." Defendant asserts he questioned this advice because there was a video from Popeye's, where the incident occurred, which was clear enough for him to recognize himself, and the truck shown in the video, which had distinctive dents and a tool box, was clearly his father's truck. He also knew that two witnesses had identified him from photo arrays and a tipster had identified him as the driver of the truck. He asserts that the law enforcement video, in which he claimed he was innocent, showed him displaying an arrogant attitude that sealed his fate.

Defendant concludes that at sentencing, he made a "good and sincere presentation of contrition, confession, and apology to the victim and the Court," while the State argued for a life sentence, which he describes as unreasonable in light of his mitigation and lack of criminal record. He states:

> Had Defendant "come clean" as he intended to, acknowledged being intimidated by "evil" detectives

14

> into his video statement, and expressed the same
> contrition and apology as he did at sentencing during
> the trial, there is a reasonable probability that the jury
> would have arrived at a lesser charge of manslaughter.

He argues counsel knew the interview with law enforcement was "replete with falsehoods" but "still urged the jury to accept as true what she knew to be false," suggesting that she violated the Rules Regulating the Florida Bar.

Thus, his position in the instant Motion is that counsel's only reasonable strategy was to allow him to admit the crime, express his contrition, and challenge the interview with police.

This claim lacks merit.

> "Judicial scrutiny of counsel's performance must be
> highly deferential." Strickland, 466 U.S. at 689.
> Appellant is not entitled to perfect or error-free counsel,
> only reasonably effective counsel. Waterhouse v. State,
> 522 So. 2d 341, 343 (Fla. 1988). Just because trial
> counsel's strategy is unsuccessful, does not mean that
> their representation is automatically inadequate.
> Sireci v. State, 469 So. 2d 119, 120 (Fla. 1985).

Black v. State, 304 So. 3d 45, 48 (Fla. 1st DCA 2020).

Prior to the start of jury selection, the Court asked Defendant whether he was prepared to proceed to trial, whether he had enough time to confer with counsel, and whether he was aware that the State would consider any defense plea offers.[FN1] Defendant responded affirmatively and did not express any dissatisfaction with counsel. After the State rested its case, the Court advised him that he had a constitutional right to testify and that it was his decision to make. He asked to speak with counsel, then replied that he would like to remain silent. Therefore, Defendant had opportunities to tell the Court that he wanted to admit guilt or that he wanted to take the stand and tell the truth, but he did not do so during these inquiries or at any other point before or during trial.

15

Furthermore, on page[s] 16-17 of his Motion, Defendant acknowledges "[t]he evidence of guilt was overwhelming and extremely inflammatory," citing several portions of the testimony presented by the State. [FN2] The State's evidence established that Defendant exited his truck after going through the drive-through lane at a Popeye's restaurant, entered the store, began beating the victim, and then shot the victim.

If Defendant had then taken the stand to admit that he instigated the encounter, after which he "felt the sudden need to act to avoid further escalation, and to escape the potential that he would himself be outnumbered and accosted," there is no reasonable probability that the jury would have convicted him of a lesser offense such as manslaughter. The version of events the Defendant now says he wanted to tell the jury still satisfies the elements of the crime he was convicted of. Fla. Stat. § 782,04(2). Thus, Defendant cannot establish that counsel's actions prejudiced him with regard to the conviction or that no reasonably competent attorney would have pursued the same strategy, given the facts and circumstances of this case.

In addition, he cannot establish that counsel's actions prejudiced the outcome of the sentencing hearing. While the State requested a life sentence, counsel asked the Court not to exceed the 25-year minimum mandatory term. The State suggested that if Defendant really felt sorry, "responsibility could have been taken at the very beginning," but counsel promptly argued that Defendant had the right to a trial, and the Court could not hold that against him in making a decision regarding sentencing. The Court agreed and ultimately imposed the statutory maximum of 30 years.

Defendant finds it "perplexing" that counsel allowed him "to tell the truth anyway at sentencing and to do so under oath," which "forever prejudiced Defendant's right to a new and fair trial" should he succeed in his postconviction proceedings. However, it would have been prejudicial for him to "tell the truth" during trial, as he alleges counsel should have allowed him to do, because he would have been under oath then, as well, and there is no reasonable probability that taking responsibility would have absolved him of guilt or resulted in a conviction for a lesser offense.

16

[FN1] The prosecutor confirmed that the State had not extended any offers.

[FN2] In his Motion, Defendant cites certain specific pages of the trial transcript; however, the exhibits attached to [the trial court order] include additional pages where the most incriminating testimony appears . . . .

Resp. Ex. I at 39-41 (record citations omitted). Petitioner filed a motion for rehearing. Id. at 177-88. The trial court denied the motion, but clarified that as to ground one, it found counsel's advice was not deficient and that "other reasonable attorneys could and potentially would have discouraged [Petitioner] from taking the stand." Id. at 194. Petitioner appealed, and the First District Court of Appeal per curiam affirmed without a written opinion. Resp. Ex. L.

The Court addresses Petitioner's claim in accordance with the deferential standard for federal court review of state court adjudications. A defendant's right to testify at a criminal trial is a fundamental and personal right that defense counsel cannot waive. See United States v. Teague, 953 F.2d 1525, 1532 (11th Cir. 1992). In Teague, the Eleventh Circuit held that it is defense counsel's responsibility to advise the defendant of this right and the strategic implications and "that the appropriate vehicle for claims that the defendant's right to testify was violated by defense counsel is a claim of ineffective assistance [under Strickland]." Id. at 1534. Teague reasoned that an attorney's performance would be deficient under the first prong of the Strickland test if counsel refused to accept the defendant's decision to testify and would not call

17

him to the stand or if defense counsel never informed the defendant of the right to testify and that the ultimate decision belonged to the defendant. Id. The Eleventh Circuit rejected the defendant's ineffective assistance of counsel claim because the trial court found that counsel had advised the defendant of his right to testify and that he should not exercise that right, and the defendant did not protest. Teague, 953 F.2d at 1535.

Here, the record shows that following the state's case, the trial court conducted a colloquy with Petitioner, under oath, about his decision to testify.

> THE COURT: I must also advise you that you have a constitutional right to testify. It is your right to testify or not testify. And no one can make that decision except for you. Miss Wright, for the record, have you had time to communicate with your client about the decision of whether or not he is going to testify?
>
> MS. WRIGHT: Yes, Your Honor.
>
> THE COURT: To the State, does the defendant have any prior felony convictions or crimes of dishonesty or anything like that that could be used for cross examination?
>
> MS. WHEELER-SANCHEZ: Not to my knowledge, Your Honor.
>
> THE COURT: Okay. And at this time, do you believe your client is ready to tell me if I ask him what his decision is?
>
> MS. WRIGHT: Yes, Your Honor.
>
> THE COURT: Mr. Pastures, have you had enough time to consult with your attorney, Miss Wright, regarding this decision of whether or not you are going to testify? Have you had enough time?

18

> [PETITIONER]: I would ask for a few more minutes.
>
> THE COURT: You can speak to her for a few more minutes.
> That's fine. Okay.
>
> So we'll technically go into a recess so Mr. Pastures can talk
> to her.
>
> (Conferring with co-counsel.)
>
> (Short recess.)
>
> (Defendant present.)
>
> THE COURT: We're back on the record. All the attorneys are
> here. Mr. Pastures is here.
>
> Sir, did you have enough additional time to speak with your
> attorney?
>
> [PETITIONER]: Yes, ma'am.
>
> THE COURT: And are you ready at this time to state in open
> court of your decision?
>
> [PETITIONER]: Yes, ma'am. I would like to remain silent.
>
> THE COURT: Very well. You have a constitutional right to
> remain silent.

Resp. Ex. B at 639-41. This evidence shows that after thoughtfully considering his right to testify, and conferring with counsel about that decision, Petitioner voluntarily and knowingly made the decision to not testify. Petitioner now asserts that had he testified at trial, he would have admitted to shooting the victim and expressed regret, but his recorded interview with police contradicted

19

this new proposed line of defense. And Petitioner's argument that such testimony would have produced a different outcome at trial is speculative and, honestly, doubtful. Likewise, Petitioner's proposed testimony would not have likely resulted in a favorable plea offer because the record shows the state refused to offer a plea deal.

To that end, the Court finds that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts given the evidence presented in the state court proceedings. Ground One is denied.

**b. Ground Two**

Petitioner asserts that his trial counsel was ineffective for failing to challenge the admissibility of Petitioner's videotaped statement. Doc. 1 at 11. According to Petitioner, he made the statement to police after police "lured" Petitioner to Florida from New York to "induce" him into giving the statement. Id. He contends that the statement ultimately led to his arrest, and trial counsel was also ineffective for failing to challenge the arrest. Id.

Petitioner raised this claim in his Rule 3.850 motion. Resp. Ex. I at 22-29. The trial court summarily denied the claim as follows:

> Defendant alleges counsel failed to challenge his videotaped statement, which he argues was obtained by law enforcement under false pretenses after detectives lured him to Florida from New York

20

in order to induce him to give a statement that led to his arrest. He acknowledges he "sought refuge in New York shortly after the crime" and intended to remain there until he received "pretextual" phone calls indicating that he needed to sign probation forms. He argues the Jacksonville Sheriff's Office already had an arrest warrant, but Detective Williams admitted that he gave Defendant no indication of what was going on as he ushered a handcuffed Defendant to sit in front of the camera.

This claim lacks merit. It is irrelevant whether law enforcement lured Defendant back to Florida under false pretenses. "Deception does not negate consent. Absent coercion, threats or misrepresentation of authority, the courts have long recognized deception as a viable and proper tool of police investigation." Wyche v. State, 906 So. 2d 1142, 1144 (Fla. 1st DCA 2005), approved, 987 So. 2d 23 (Fla. 2008). Defendant's allegations establish, at most, that law enforcement agents induced him to return to the State of Florida, but do not establish that they exercised coercion, threats, or misrepresented their authority. There is also nothing to indicate that they induced him to make any incriminating statements during the interview that followed.

Detective Williams testified that he called Defendant to say that he needed to speak with Defendant but admitted that he did not say what it was about. The State introduced the videotaped interview, which demonstrates that the detective read Miranda[6] rights and Defendant indicated that he understood. The fact that Defendant was not informed of the arrest warrant is not sufficient to find that his waiver was involuntary. State v. Manning, 506 So. 2d 1094, 1096 (Fla. 3d DCA 1987); Perez v. State, 919 So. 2d 347, 361 (Fla. 2005). The record demonstrates that Defendant was not coerced into making the videotaped statement. Therefore, counsel had no basis to move to suppress the video or to challenge the arrest, and there is no reasonable probability that such motions would have been granted.

---

[6] Miranda v. Arizona, 384 U.S. 436 (1966).

21

Resp. Ex. I at 43-45 (record citations omitted). Petitioner appealed, and the First DCA per curiam affirmed the denial without a written opinion. Resp. Ex. L.

The Court addresses Petitioner's claim in accordance with the deferential standard for federal court review of state court adjudications. In doing so, the Court notes that the Supreme Court has explained that "it seems self-evident that one who is told he is free to refuse to answer questions is in a curious posture to later complain that his answers were compelled." Colorado v. Spring, 479 U.S. 564, 859 (1987) (quotation omitted). Notably, Miranda requires police to inform a petitioner, without qualification, that "anything he says may be used against him." Id. at 577 (emphasis added). As such, a petitioner's "awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." Id. Also, the Eleventh Circuit has rejected a per se rule that statements obtained by police deception must be suppressed. See United States v. Farley, 607 F.3d 1294, 1327 (11th Cir. 2010); see also United States v. Castaneda–Castaneda, 729 F.2d 1360, 1363 (11th Cir.1984) ("[T]he police's use of a trick alone will not render a confession involuntary."). "Unlike physical violence or the threat of it, which makes any resulting statement per se involuntary, the effect of psychological pressure or

deception on the voluntariness of a statement depends on the particular circumstances in each case." Farley, 607 F.3d at 1328.

Here, Petitioner contends that his statements should have been suppressed because police tricked him into coming back to Florida, telling him that he needed to sign some probation paperwork when really police already had an arrest warrant for the subject shooting. But even if police did trick him into coming back to Florida, that fact, under the totality of the circumstances, had no impact on the constitutional validity of his Miranda waiver and decision to speak to police. Any motion to suppress the interview or arrest would have been meritless. And, thus, the Court finds that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts given the evidence presented in the state court proceedings. Ground Two is denied.

## V. Supplement

### Ground Three and Ground Four

In Ground Three, Petitioner alleges that his trial counsel was ineffective for failing to file a motion in limine to strike portions of his police interrogation where Detective Williams made statements indicating officers already determined Petitioner's guilt. Doc. 14 at 8. According to Petitioner, during the interview, Williams discussed with Petitioner aspects of the investigation that

led police to identifying Petitioner as a suspect, such as footage of Petitioner's father's truck and that the employees of the restaurant identified Petitioner as the assailant. Id. at 8-9. Petitioner contends that Williams also improperly made comments about his own opinions regarding Petitioner's guilt, including that he believed the sketch looked like Petitioner and that the nature of the crime indicated Petitioner was "cold-blooded." Id. at 9. He argues that because officers are deemed more credible witnesses, this testimony contributed to the jury's guilty verdict. Id.

In Ground Four, Petitioner asserts that his trial counsel was ineffective for failing to investigate Florida's stand your ground immunity from prosecution and for failing to file a pretrial motion to dismiss. Doc. 14 at 12. Petitioner contends that he advised counsel about the circumstances surrounding the shooting, notably that while Petitioner was going through the drive-thru, the victim and Jones were "pointing, laughing, and saying something in his direction." Id. at 12. In response, Petitioner asserts he parked his truck, went inside the Popeyes, and asked the victim and Jones what they had said. Id. The victim then purportedly stated, "F*ck you broke a@s n*****," before "readying himself to punch" Petitioner. Id. According to Petitioner, he advised counsel that he then punched the victim several times to defend himself. Id. at 12-13. But when Petitioner turned to leave, he looked behind him and noticed both the victim and Jones advancing and trying to attack

24

Petitioner. Id. Petitioner states he was outnumbered and in fear for his life, so he pulled out his gun and shot the victim to stop their advance. Id.

Respondents assert that both Grounds Three and Four are untimely because they fail to relate back to any claim that was timely asserted in the Petition. Doc. 16 at 4-9. Alternatively, they contend that even if these claims are timely filed, they are still due to be dismissed because Petitioner failed to exhaust the claims in state court. Id. at 9.

Petitioner argues that Ground Three relates back to Ground Two as both claims challenge police conduct "centered in time and type around the videotaped interrogation." Doc. 18 at 4. He also contends that Ground Four relates back to Ground One as trial counsel's failure to seek immunity based on Florida's stand your ground law relates to trial counsel's failure to allow Petitioner to testify at trial about his involvement in the incident. Id.

Federal habeas petitions are civil in nature and are governed by the Federal Rules of Civil Procedure. See Habeas Corpus Rule 11; Fed. R. Civ. P. 81(a)(4). As such, a habeas petition may be amended as provided in the rules of procedure applicable to civil actions. See 28 U.S.C. § 2242. Under the Federal Rules of Civil Procedure, pleading amendments relate back to the date of the original pleading when "the claim . . . asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Fed. R. Civ. P. 15(c)(2). An amendment to a

25

habeas petition may relate back "[s]o long as the original and amended petitions state claims that are tied to a common core of operative facts." <u>Mayle v. Felix</u>, 545 U.S. 644, 664 (2005). A new claim, however, does not meet the standard and thus does not relate back "when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." <u>Id.</u> at 650. The terms "conduct, transaction, and occurrence" are to be narrowly construed and are not synonymous with "trial, conviction or sentence." <u>Id.</u> at 664.

Upon review, the Court finds that neither Ground Three nor Ground Four relate back to the timely raised claims in the Petition. As to Ground Three, Petitioner challenges police conduct that occurred during the actual interview with Detective Williams, while Ground Two challenges the tactics police used to get Petitioner to come back to Florida from New York and agree to speak to police. While both claims may involve the underlying police interrogation, the claims differ in both time (during the interrogation versus prior to interrogation) and type (purported biased and prejudicial questioning during interrogation versus deceptive police tactics to get Petitioner to agree to police interview). Likewise, the allegations of Ground Four do not relate back to the claim in Ground One because they also differ in both time (failure to file a pretrial motion to dismiss based on immunity from prosecution versus failure to allow Petitioner to testify at trial) and type (complete immunity from

prosecution versus going to trial and raising a self-defense theory). As such, the Court finds that Grounds Three and Four do not relate back to any timely claim raised in the Petition and thus they are untimely filed.

In any event, assuming Grounds Three and Four relate back to the claims raised in the Petition, they are still due to be dismissed because they are unexhausted and procedurally defaulted. Petitioner admits he failed to present these issues to the state court, but he seeks to overcome this procedural bar by relying on Martinez v. Ryan, 566 U.S. 1 (2012), and arguing that he can show "cause" to excuse his default because he did not have counsel when he filed his Rule 3.850 motion. Doc. 18 at 6-11.

Under Martinez, Petitioner must prove more than the general assertion that the trial court did not appoint counsel in the initial-review collateral proceeding. 566 U.S. at 14. Petitioner must "also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." Id. (citations omitted); see also Lambrix v. Sec'y Fla. Dept. of Corr., 851 F.3d 1158, 1164 (11th Cir. 2017). Conversely, his claim is "insubstantial" if "it does not have any merit or . . . is wholly without factual support." Id. at 16. For the reasons that follow, the Court finds that even if Petitioner shows that his lack of postconviction counsel caused his procedural default, he cannot show that his underlying ineffective assistance of counsel claims are substantial.

27

In Ground Three, Petitioner argues that the jury relied heavily on Detective Williams's statements indicating his opinion of Petitioner's guilt during the interview, and had counsel moved to suppress those statements, the outcome of his case would have been different. But during trial, before Petitioner's recorded interview with Detective Williams was played, the trial court read this instruction to the jury:

> THE COURT: Members of the jury, at some point fairly shortly, I expect that you will be listening to and viewing an audio/video recording. The Court instructs you that the recording has been edited to eliminate irrelevant portions that would not add to your understanding of the case. The fact that the recording has been edited should not concern you in any way and must not impact the way that you view or listen to or consider this evidence.

> Another instruction is as follows: Members of the jury, I anticipate that shortly, you're about to hear and watch a recorded interview that contains opinions and statements by law enforcement officers to the defendant, Mr. Pastures. These opinions and statements are pertinent only to explain the reactions and responses they elicit. You are not to consider these opinions and statements by the police officer as true but only to establish the context of Mr. Pastures' reactions and responses.

Resp. Ex. B at 477-78. The state then entered into evidence, without objection, the recorded interview. Id. at 481. As the interview played for the jury, the state paused the recording and asked Detective Williams about any methods he used in questioning Petitioner, to which Williams explained the following:

Q: Detective, are you about to use an investigative technique here?

A: Yes.

28

Q: And is that an interview technique?

A: Yes.

Q: What is that?

A: I'm about to minimize in the interview. In other words, I'm minimizing the actual act of the crime so that I can get on that level with the person I'm interviewing. And I can say, hey, was this an accident? Did you mean to do this?

And typically, when we minimize that, people tend to start to tell us the truth because we minimize the act. I'm not calling it a "shooting." Just calling it an "accident."

Q: And so that doesn't mean you believe it's an accident. This is just –

A: That is correct.

Q: This is part of your interview technique.

A: Correct.

Q: And you're trained to do this?

A: Yes. I've taken interview classes.

Resp. Ex. B at 497-98. Considering the trial court's instruction, as well as Detective Williams's testimony explaining his interview techniques, Petitioner cannot demonstrate that any statements that may have portrayed Detective Williams's "opinion" affected his case. Indeed, absent this evidence, the jury was still presented with the surveillance footage of Petitioner driving his father's truck and entering the restaurant and shooting the victim. Resp. Ex. B at 250-57. And as the footage played for the jury, Jones provided eyewitness testimony

29

describing the events depicted in the footage. Id. Based on this evidence, Petitioner cannot show that but for trial counsel's alleged error, the outcome of his trial would have been different. Because Petitioner cannot satisfy the prejudice prong of Strickland, he cannot rely on Martinez to excuse the procedural default of this claim. Likewise, Petitioner has not demonstrated that failure to consider this claim on the merits will result in a fundamental miscarriage of justice. Ground Three is denied.

In Ground Four, Petitioner contends that trial counsel was ineffective for failing to file a pretrial motion to dismiss based on Florida's stand your ground law. Doc. 14 at 12-13. According to Petitioner, he punched the victim because he was defending himself, and then when he turned to leave the restaurant, he noticed the victim and Jones "advancing on him, trying to attack," so he shot the victim "to stop their advance." Id. at 13. He contends that trial counsel knew about this information and had enough evidence to file a motion seeking immunity from prosecution. Id.

Section 776.012(2), Florida Statutes, defines Florida's general self-defense as follows: "A person is justified in using . . . deadly force if he [] reasonably believes that using . . . such force is necessary to prevent imminent death or great bodily harm to himself . . . . A person who uses . . . deadly force in accordance with this subsection does not have a duty to retreat and has the right to stand his or her ground if the person using . . . the deadly force is not

engaged in a criminal activity and is in a place where he or she has a right to be." Fla. Stat. § 776.012(2). On the other hand, "stand your ground" immunity refers to Florida Statutes § 776.032(1), which provides that "[a] person who uses . . . force as permitted in § 776.012, . . . is justified in such conduct and is immune from criminal prosecution . . . for the use . . . of such force . . . ." Fla. Stat. § 776.032. When a defendant seeks immunity under § 776.032, the trial court must conduct a non-jury, pretrial hearing to determine whether the defendant is immune from criminal prosecution. Peterson v. State, 983 So. 2d 27, 29 (Fla. 1st DCA 2008). At that pretrial hearing, the court "confront[s] and weigh[s] only factual disputes," and determines "whether the defendant has shown by a preponderance of the evidence that the immunity attaches." Id. at 30.

Here, neither Petitioner's actions nor statements suggest that he was justified in using deadly force. Instead, Petitioner's conduct was indicative of his culpability and desire to separate himself from the incident. The evidence shows that Petitioner entered the Popeyes even though it was closed to customers and initiated the confrontation. Even assuming that the victim was willing and able to physically fight Petitioner after Petitioner punched the victim, Petitioner does not allege and there is no record evidence that anyone other than Petitioner had a deadly weapon on his or her person. Also, upon Petitioner's first contact with police, he denied all participation in the crime. He

31

left Florida and went to New York, and when speaking to Detective Williams, he adamantly denied being at the Popeyes the night of the shooting.

Indeed, likely because of his statements to police and his decision to leave the state following the shooting, trial counsel set forth a misidentification defense at trial as an attempt to explain Petitioner's conduct. But after reviewing the state's evidence, including surveillance footage of Petitioner in his father's truck and Petitioner committing the crime, the jury found Petitioner guilty of attempted second degree murder beyond a reasonable doubt. Considering this evidence, the Court finds it is unlikely that a trial judge would have rendered a different judgment at a stand your ground hearing under a lower standard of proof. To that end, Petitioner cannot establish prejudice under Strickland, and thus he cannot rely on Martinez to excuse the procedural default of this claim. Likewise, Petitioner has not demonstrated that failure to consider this claim on the merits will result in a fundamental miscarriage of justice. Ground Four is denied.

Accordingly, it is

**ORDERED AND ADJUDGED:**

1. The Petition (Doc. 1) and Supplement (Doc. 14) are **DENIED**, and this case is **DISMISSED with prejudice**.

2. The **Clerk** shall enter judgment dismissing this case with prejudice, terminate any pending motions, and close the file.

32

3.     If Petitioner appeals this Order, the Court denies a certificate of appealability. Because this Court has determined that a certificate of appealability is not warranted, the Clerk shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.[7]

**DONE AND ORDERED** at Jacksonville, Florida, this 10th day of February, 2026.



TIMOTHY J. CORRIGAN
Senior United States District Judge

Jax-7

C:     Tyrone John Pastures, #J14131
       Counsel of record

---

[7] The Court should issue a certificate of appealability only if the Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)). Here, after consideration of the record as a whole, the Court will deny a certificate of appealability.